## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA JACKSON, individually and on behalf of all others similarly situated, 1530 Rhode Island Ave. NE, # 508 Washington, DC 20018 ) ) ) ) ) | |
| Plaintiff, ) | Civ. No. _____ |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| WGL HOLDINGS, INC., 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| MICHAEL D. BARNES, 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| GEORGE P. CLANCY, JR., 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| JAMES W. DYKE, JR., 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| NANCY C. FLOYD, 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| LINDA GOODEN, 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| JAMES F. LAFOND, 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| DEBRA L. LEE, 101 Constitution Avenue, NW Washington, D.C., 20080 ) ) ) | |
| ) | |
| TERRY D. MCCALLISTER, 101 Constitution Avenue, NW ) ) | |

Washington, D.C., 20080       )
                                     )
and                                )
                                     )
DALE S. ROSENTHAL,       )
101 Constitution Avenue, NW   )
Washington, D.C., 20080       )
                                     )
            Defendants.      )

## CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND INDIVIDUAL CLAIMS FOR VIOLATION OF SECTIONS 14(a) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Lisa Jackson ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

### INTRODUCTION

1.     Plaintiff brings this action on behalf of herself and the public stockholders of WGL Holdings, Inc. ("WGL" or the "Company") against WGL's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On January 25, 2017, AltaGas Ltd. ("AltaGas") and the Company announced that they had entered into a definitive agreement on January 25, 2017 ("Merger Agreement") under which AltaGas will acquire all of the outstanding shares of WGL in an all-cash transaction (the "Proposed Transaction"). If consummated, WGL stockholders will receive $88.25 in cash for each share of WGL stock that they own ("Merger Consideration"). The Proposed Transaction was valued at approximately $6.4 billion at the time of the announcement.

3.     On March 10, 2017, Defendants issued materially incomplete and misleading disclosures in the Form PREM14A Preliminary Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed

Transaction. The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.      Accordingly, Plaintiff alleges herein that Defendants have breached their fiduciary duties and violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331–32, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.      The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of shares of WGL common stock.

9.      WGL is a corporation organized and existing under the laws of the State of Virginia. The Company maintains its principal executive offices at 101 Constitution Avenue, N.W.,

Washington, D.C., 20080.  WGL common stock trades on the New York Stock Exchange under the ticker symbol "WGL."

10.     Defendant Michael D. Barnes ("Barnes") has served as a director of the Company since November 2000 and served as a director of Washington Gas Light Company since 1991.  As Chairman of the Governance Committee, Defendant Barnes serves as Lead Director for the Board.

11.     Defendant George P. Clancy, Jr. ("Clancy") has been a director since December 2000.

12.     Defendant James W. Dyke, Jr. ("Dyke") has been a director of the Company since September 2003.

13.     Defendant Nancy C. Floyd ("Floyd") has been a director of the Company since June 2011.

14.      Defendant Linda Gooden ("Gooden") has been a director of the Company since April 2013.

15.     Defendant James F. Lafond ("Lafond") has been a director of the Company since September 2003.

16.     Defendant Debra L. Lee ("Lee") has served as a director of the Company since November 2000.

17.     Defendant Terry D. McCallister ("McCallister") has served as a director of the Company since October 2009.  Defendant McCallister is Chairman of the Board and Chief Executive Officer of WGL, and has been such since October 2009.

18.     Defendant Dale S. Rosenthal ("Rosenthal") has been a director of the Company since October 2014.

19.    Defendants Barnes, Clancy, Dyke, Floyd, Gooden, Lafond, Lee, McCallister, and Rosenthal are collectively referred to as Individual Defendants and/or the Board.

20.    Non-party AltaGas is a North American energy infrastructure company headquartered at 1700, 355 4 Avenue SW, Calgary, Alberta, T2P 0J1. AltaGas common stock trades on the Toronto Stock Exchange under the ticker symbol "ALA."

## CLASS ACTION ALLEGATIONS

21.    For purposes of the breach of fiduciary duties claims, Plaintiff brings this action individually and as a class action on behalf of all holders of WGL stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

22.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

23.    The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of January 23, 2017, WGL had 51,219,000 shares of common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

24.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

a.    whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction; and

b.     whether Plaintiff and the other members of the Class would be irreparably

harmed were the transactions complained of herein consummated.

25.     Plaintiff's claims are typical of the claims of the other members of the Class and

Plaintiff does not have any interests adverse to the Class.

26.     Plaintiff is an adequate representative of the Class, has retained competent counsel

experienced in litigation of this nature, and will fairly and adequately protect the interests of the

Class.

27.     The prosecution of separate actions by individual members of the Class creates a

risk of inconsistent or varying adjudications with respect to individual members of the Class, which

could establish incompatible standards of conduct for Defendants.

28.     Plaintiff anticipates that there will be no difficulty in the management of this

litigation. A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

29.     Defendants have acted on grounds generally applicable to the Class with respect to

the matters complained of herein, thereby making appropriate the relief sought herein with respect

to the Class a whole.

30.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of

himself and the Class to prevent the irreparable injury that the Company's stockholders will

continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

**Company Background and Potential for Growth**

31.     WGL is a financial services holding company headquartered in Washington, D.C.

WGL consists of Washington Gas, WGL Energy Services, WGL Energy Systems, WGL

Midstream and Hampshire Gas. WGL provides natural gas, electricity, green power and energy services, including generation, storage, transportation, distribution, supply and efficiency.

32.     The results from the most recent quarterly earnings report, announced on February 8, 2017, demonstrate that the Company was successfully pursuing its standalone strategy.  The Company announced that it was increasing the annual dividend by $.09 per share, a 5% increase and a 41st consecutive annual increase by the Company.

33.     But despite the continued steady growth of the Company as an independent entity, the Board decided to sell WGL to another Company, and recommends the sale with a materially misleading Proxy.

**The Sale Process**

34.     WGL began considering selling the Company in April 2016 when the Company executed an engagement letter with Goldman Sachs & Co. ("Goldman") to assist the Company with any acquisition proposals it might receive.  The Company had previously engaged Lazard Frères & Co. LLC ("Lazard") to assist with "ongoing corporate preparedness planning, valuation and various strategic matters."

35.     On July 13, 2016, a company contacted Lazard to express an interest in a potential transaction with the Company.  After discussing the contact with Defendant McCallister, Lazard conveyed the message that the Company was not engaged in a sales process.

36.     On September 8, 2016, J.P. Morgan Securities LLC contacted Defendant McCallister on behalf of AltaGas to express an interest in a potential strategic transaction.  The Company again responded that the Company was not engaged in a sales process.

37.     On September 21, 2016, another investment banking firm contacted Defendant McCallister to inform him that its client, Party A, had an interest in a potential strategic transaction.  Again, McCallister informed them that the Company was not engaged in a sales process.  On

September 26, 2016.  David Harris ("Harris"), Chief Executive Officer of AltaGas, contacted Defendant McCallister regarding a potential acquisition of the Company.  Defendant McCallister informed Harris that the Company was not engaged in a sales process, but he would convey the interest to the Board.

38.     The next day, the Board held a regularly scheduled meeting.  After discussions, the Board authorized Defendant McCallister to engage in preliminary discussions with AltaGas and other companies interested in a potential strategic transaction with the Company.

39.     The Chief Executive Officer of Party A contacted Defendant McCallister on October 2, 2016 to indicate that Party A would subsequently send a written proposal for a potential merger.

40.     On October 5, 2016, Goldman notified Defendant McCallister that Party B had contacted Goldman to express an interest in setting up a meeting with Mr. McCallister regarding a potential strategic transaction.

41.     Defendant McCallister met with Party B on October 11, 2016.  Party B expressed an interested in a potential strategic transaction, and Defendant McCallister provided Party B with publicly available information on October 13, 2016.

42.     The next day, Defendant McCallister and Mr. Gautam Chandra ("Chandra"), Senior Vice President of the Company, had dinner with Harris and the AltaGas CFO and Chairman.  On November 1, 2016, Harris informed Defendant McCallister that AltaGas expected to deliver an indication of interest by November 21, 2016.

43.     On November 2, 2016, Party A delivered a written indication of interested from Party A, proposing a merger-of-equals between the two companies.  At the exchange ratio

considered, the proposal provided little to no premium over the Company's then-current trading price.

44.     Defendant McCallister responded to Party A on November 4, 2016, communicating that the proposal did not offer a sufficient premium to warrant his discussion of the offer with the WGL Board.

45.     Party B delivered a written indication of interest from Party B on November 9, 2016, contemplating a 20% to 30% premium and either an all-cash transaction or a mix of stock and cash consideration.

46.     Defendant McCallister and Chandra discussed a potential strategic transaction with Party A on November 14, 2016.  Party A modified the proposed merger consideration to offer a 10% premium to the current trading price of WGL's stock.

47.     The Board held a special meeting on November 15, 2016 to discuss the strategic options available to the Company.  After discussion, the Board determined that the merger-of-equals transaction proposed by Party A was not in the Company's best interest because of the low premium, and the potential volatility in the value of the consideration in the form of Party A's common stock.  The Board authorized the Company to engage in further discussions with Party B and AltaGas concerning a potential merger for all-cash consideration. The Board also authorized Defendant McCallister to direct Goldman to contact four more additional companies to explore potential all-cash strategic transactions.

48.     Defendant McCallister communicated the Board's decision to Party A on November 18, 2016.

49.     The same day, Defendant McCallister and Harris met in person in Washington, D.C.  Harris delivered a written indication of interest for an all-cash transaction with merger

consideration between $88 and $92.50, with a request for exclusivity in merger negotiations. "The written indication of interest also noted AltaGas' history of positive and constructive relationships in each of its regulatory jurisdictions, and highlighted the strong social fit between the two companies, noting that both companies shared a culture of excellence with respect to service, reliability and safety for their respective customers."

50.     Between November 19, 2016 and November 21, 2016, Goldman contacted three other companies (Parties C, D, and E) for the purpose of exploring an all-cash merger with the Company. Goldman requested that the parties provide an indication of interest by December 5, 2016. Goldman also reached out to Party B to request any updates to its proposal by December 5, 2016.

51.     On November 25, 2016, the Company entered into a non-disclosure agreement with AltaGas containing a standstill provision in order to commence due diligence.

52.     On November 29, 2016, Bloomberg published an article reporting that the Company had held discussions with a Spanish company, Iberdola S.A. regarding a potential strategic transaction and that the Company was weighing a potential sale. This led to an increase in trading volume, and a nine-percent price increase that day.

53.      That same day, Party C informed Goldman that they would not be submitting an indication of interest.

54.     On December 5, 2016, Party D informed Defendant McCallister that they would not be submitting an indication of interest because they could not offer a meaningful premium. The same day, Party E informed Goldman that it would not be submitting an indication of interest for regulatory and compatibility reasons.

55.     On December 6, 2016, Party B orally communicated an offer of approximately $80 per share, but provided no written proposal.

56.     The Board met on December 7, 2016 for updates on the strategic process. Defendant McCallister informed the Board that the Company had received inquiries from three additional companies following the Bloomberg article.

57.     Following discussion, the Board authorized further discussions with AltaGas and directed Defendant McCallister to inform Party B that its indicated price range did not merit further discussion at this time.

58.     Over the next several weeks, the Company and AltaGas conducted further negotiations concerning the terms of a merger agreement, the merger consideration, and potential regulatory concerns.  On December 19, 2016, AltaGas indicated a price range from $90 to $91.50 per share.  On December 26, 2016, AltaGas increased this range to $90.50 to $92.00 per share. However, following a leak that AltaGas was pursuing the purchase of the Company on January 12, 2017, and findings related to due diligence, AltaGas reduced its proposed price to $88 per share on January 17, 2017.  Defendant McCallister initially indicated that this price was unacceptable.

59.     Following the Board's discussion of this price drop and other considerations, as well as a best-and-final offer from AltaGas of $88.25, the Board agreed to move forward at the new, lower consideration.

60.     On January 21, 2017, the Board further discussed the merger and reviewed an overview of analysis from Goldman and Lazard.

61.     The Board held a special meeting on January 25, 2017 that was attended by members of Executive Management.  Defendant McCallister updated the Board on negotiations and reported that all of the merger documents had been finalized for Board approval.  Both

Goldman and Lazard presented oral fairness opinions and the financial analysis underlying their opinions.  Following further discussion, the Board unanimously adopted the plan of merger and agreed to recommend the merger to the Company's stockholders.

62.     Following the meeting, the Company and AltaGas executed the Merger Agreement and other transaction documents.

63.     The two companies then issued separate press releases.

64.     AltaGas' press release stated the following relevant information:

> AltaGas Ltd. ("AltaGas") (TSX:ALA) and WGL Holdings, Inc. ("WGL") (NYSE:WGL) announced today the entering into of a definitive agreement and plan of merger for AltaGas to acquire WGL in an all cash transaction (the "Transaction") valued at approximately C$8.4 billion. WGL is a diversified energy infrastructure company which is the sole shareholder of Washington Gas Light Company, a regulated natural gas utility headquartered in Washington D.C., has a growing contracted midstream franchise in the Marcellus/Utica, and also owns non-regulated contracted power and energy marketing businesses throughout the United States. The Transaction enhances AltaGas' position as a leading, diversified North American energy infrastructure company, with assets of approximately C$22 billion. AltaGas will have, on a combined basis, natural gas rate base assets of C$4.5 billion and over C$7 billion of identified capital investment opportunities identified through to 2021 in highly attractive clean energy lines of business.

> "We look forward to welcoming WGL employees and customers to AltaGas," said David Harris, President and CEO of AltaGas. "This acquisition provides us with a robust, complementary set of energy businesses that greatly increase our scale and diversity. Our first priority in making this successful is to continue serving WGL's customers and communities with safe, reliable and affordable service and maintaining the strong relationships WGL has built with regulators."

> "This is a significant and positive event for WGL and all of its stakeholders -- its employees, customers and shareholders," said Terry McCallister, Chairman and CEO of WGL. "Our leadership team and Board of Directors are convinced that we have found exactly the right partner in AltaGas. We are confident that, together, we will be a more diverse and stronger company that will open up new and exciting opportunities to provide value for all of our stakeholders."

> Under the terms of the Transaction, WGL shareholders will receive US$88.25 in cash per WGL share, which represents an 11.8 percent premium to WGL's

closing share price on January 24, 2017. The purchase price also represents a premium of 27.9 percent to WGL's closing share price on November 28, 2016, the day prior to news reports of a potential acquisition of WGL by a third party. The Transaction represents a total enterprise value of C$8.4 billion, including the assumption of approximately C$2.4 billion of debt.

The Boards of Directors of AltaGas and WGL have unanimously approved the Transaction, which is expected to close by the end of the second quarter of 2018. The Transaction is subject to certain closing conditions, including WGL common shareholder approval and certain regulatory and government approvals, including approval by the public utility commissions of Maryland, Virginia and Washington D.C., the Federal Energy Regulatory Commission, and the Committee on Foreign Investment in the United States, and expiration or termination of any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

*** 

David Cornhill, Chairman of AltaGas said, "Creating social value has always been part of AltaGas' DNA. We welcome WGL employees with open arms and will do our best to ensure the safe, reliable and affordable service that our customers and communities deserve. Combined with WGL, AltaGas is clearly a leading Canada-based North American energy infrastructure company."

Following the completion of the Transaction, WGL's natural gas utility will continue to be regulated by the three state public service commissions and will continue to operate under the WGL brand. WGL's experienced workforce will continue to deliver safe and reliable service at reasonable rates. As part of the Transaction, AltaGas will keep WGL's headquarters in Washington D.C. and **intends to retain existing WGL executives** to assist in managing AltaGas' U.S. regulated Utility business. AltaGas will relocate the headquarters of its U.S. Power business to WGL's service region.

Mr. Harris commented, "We recognize the strength of the platform that WGL has built in Maryland, Virginia and Washington D.C., including its high-quality customer and employee bases. Like WGL, AltaGas has a strong sense of responsibility and commitment to our customers and communities. Together we look forward to building up our presence in each of these jurisdictions as we integrate our companies and further invest in the region. We also intend to expand WGL's presence in other states as well."

(emphasis added).

65.    WGL's press release stated the following relevant information:

WASHINGTON--(BUSINESS WIRE)--WGL Holdings, Inc. (NYSE: WGL) (WGL) and AltaGas Ltd. (TSX: ALA) (AltaGas) today announced that the Boards of Directors of both companies have unanimously approved a definitive agreement and plan of merger for WGL to be acquired by AltaGas in an all cash transaction for approximately $6.4 billion in cash.

"This is a significant and positive event for WGL, and our customers, employees, communities and shareholders," said Terry McCallister, Chairman and CEO of WGL. "Our leadership team and Board of Directors are convinced that we have found exactly the right partner in AltaGas. We are confident that, together, we will be a more diverse and stronger company that will open up new and exciting opportunities to provide value for all of our stakeholders."

"We look forward to welcoming WGL employees and customers to AltaGas," said David Harris, President and CEO of AltaGas. "This acquisition provides us with a robust, complementary set of business segments that greatly increase our scale and diversity. Our first priority in making this successful is to continue serving WGL's customers and communities with safe, reliable and affordable service and maintaining the strong relationships WGL has built with regulators."

AltaGas is a leading North American diversified energy infrastructure company with a focus on natural gas, power and regulated utilities. AltaGas creates value by acquiring, growing and optimizing its energy infrastructure, with a focus on clean energy sources.

As a result of the transaction, the WGL family of companies and their employees will become part of a larger, more broad-based, multinational organization. WGL will maintain its utility headquarters in Washington D.C. and continue to manage its regulated utility business, while also assisting in the management of AltaGas' U.S. regulated utility business. AltaGas also intends to relocate the headquarters of its U.S. power business to WGL's service region.

Including WGL, the new company will have its operations and assets in the United States and Canada. These efforts will not only allow WGL to maintain its significant presence in the Washington, D.C., metropolitan area, but will also incorporate AltaGas into the community. As such, WGL and AltaGas look forward to continuing to provide their customers with excellent service. WGL will also increase its substantial level of community involvement and charitable giving.

Following the closing of the transaction, WGL's natural gas utility will continue to be regulated by commissions in the District of Columbia, Maryland, and Virginia, and operate under the Washington Gas brand. WGL's experienced workforce will continue delivering high quality service to its customers at reasonable rates.

***

Mr. McCallister said, "We are proud of our company and are enthusiastic about our combination with AltaGas. Our focus at WGL has been creating value for our shareholders, while at the same time providing excellent service to our customers and to the communities we serve. This transaction not only allows our shareholders to benefit from a substantial premium on their shares, but it also ensures our customers and communities will continue to receive the same great service we have provided for decades. AltaGas shares our values, including maintaining strong working relationships we have developed with all our stakeholders. The WGL team looks forward to contributing to the combined company's future and the opportunities for growth across the organization."

"The strategic fit and compatibility of our two companies is exceptional. Both companies are strong utility operators, have a sweet spot of pipeline and midstream investments in premier supply basins, and have power and distributed generation businesses weighted to clean energy and innovations," said Mr. Harris. "With WGL joining the AltaGas family of companies, AltaGas' business will enjoy a larger, more stable and geographically diverse regulated footprint. We can also deploy capital for future growth in all lines of business with greater scope, scale, talent, access to capital and consistent strategy. For our shareholders, the transaction is expected to be meaningfully accretive to earnings and operating cash flow in the short and long term."

66.     The Proxy is silent as to negotiations between AltaGas and WGL or its executives as to the future employment of WGL executives with the combined company.

**The Proxy Misleads by Omitting Material Information**

67.     On March 10, 2016, WGL filed a materially misleading and incomplete Proxy with the SEC.  Designed to convince shareholders to vote in favor of the Proposed Transaction, the Proxy is rendered misleading by the omission of critical information concerning the process that resulted in the Proposed Transaction, the potential conflicts of interest faced by Company management, the potential conflicts of interest faced by Lazard, the financial valuations prepared by Lazard and Goldman in connection with the rendering of its fairness opinion, and the Company's expected future value as a standalone entity as evidenced by the Company's financial projections.

*Potential Conflicts Facing Company Management*

68.     The Proxy contains material misrepresentations and omissions regarding employment negotiations taking place in the lead up to the Merger Agreement.

69.     The Proxy indicates that not only did Defendant McCallister lead negotiations with AltaGas, he also controlled the Board's access to bids, as shown by his refusal on November 4, 2016 to bring Party A's offer to the Board.  Defendant McCallister and other executives also delayed the Board's knowledge of outside inquiries triggered by the Bloomberg reporting on rumors of a sale of the Company.  Defendant McCallister thus appears to have favored a transaction with AltaGas above any and all other strategic options.

70.     The Proxy materially misleads WGL stockholders when it omits discussions of the post-merger operation of WGL, and when it omits facts concerning prior communications between AltaGas and any members of WGL management regarding post-transaction retention of WGL's management.  The fact that AltaGas could state in its press release that it intended to retain WGL executives and operate WGL as a standalone company on the day of the Merger's announcement indicates such communications had been exchanged prior to the execution of the Merger Agreement.

71.     The failure to disclose the content and timing of such discussions materially misleads WGL's stockholders as to the appropriateness of the Board's decision to not conduct any kind of further market check with respect to the merger price, and the potential conflicts of interest faced by Company management in supporting the merger.

72.     The omitted information concerning the timing, content, and parties involved in these communications concerning the retention of WGL's management would significantly alter the total mix of information that Defendants used to promote the Proposed Transaction, because

the conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction.   Thus the statements in the Proxy, including but not limited to the statements concerning Defendant McAllister's role in the negotiations, are rendered materially misleading by these omissions.

### Potential Conflict of Interest Facing Lazard

73.   The Proxy is rendered materially misleading by the omission of material information concerning the potential conflicts of interest faced by Lazard in acting as the Company's financial advisor.

74.   The Proxy discloses the fee payable to Lazard by WGL as a result of the Proposed Transaction, and the compensation paid to Lazard by WGL over the past two years.

75.   However, the Proxy omits any information on AltaGas's retention of Lazard over the past two years, or any compensation paid to Lazard by AltaGas.

76.   These omissions directly impugn the independence of Lazard and materially mislead WGL stockholders as to the ability of Lazard to act in the best interest of WGL and its stockholders when providing financial advice leading up to the Proposed Transaction.  By omitting this information, the Proxy permits the inference that Lazard has not performed any services for AltaGas without any affirmative statement regarding potential services.  If Lazard has not been engaged or compensated by AltaGas, the Proxy must affirmatively reflect those facts.

### Omissions of Financial Analysis Conducted by Goldman

77.   The Proxy fails to disclose the methodologies, key inputs, and multiples relied upon and observed by Goldman in preparing its fairness opinion, including, with respect to Goldman's *Selected Companies Analysis*, (i) the mean and median values of 2017 and 2018 P/E ratios and

2017 EV/EBITDA ratios for the selected companies; and (ii) the resulting range of implied fair consideration for the Company.

78.     Here, where few other bidders came forward and were given short shrift, these analyses are material and provide a good benchmark by which to judge the fairness of the consideration offered in a proposed transaction.   Further information on the methodology is material where, as here, the description of the analysis fails to provide key inputs and the resulting fairness range calculated by the financial advisor.   Thus, the details of Goldman's analyses are material to stockholders, and disclosing some, but not all, details misleads shareholders as to the financial adviser's basis for its fairness opinion

### *Failure to Reconcile Non-GAAP Financial Measures*

79.     The Proxy fails to disclose material information concerning the Company's financial projections.   First, the Proxy discloses several non-GAAP accounting metrics for projected financial information over the years 2017-2021:   Adjusted EBIT ("earnings before interest and taxes"), non-GAAP Operating Earnings, and non-GAAP Operating Earnings per Share.   However, providing these non-GAAP metrics without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.   While the Proxy provides Capital Expenditures for each business segment within the Company, it omits the information necessary to reconcile Adjusted EBIT or non-GAAP Operating Earnings to GAAP measures.   Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.

80.     Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Proxy that includes non-GAAP financial

measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

81.     SEC regulations explicitly require companies to provide any reconciling metrics for non-GAAP financial measures where such reconciling metrics are available without unreasonable efforts.  17 C.F.R. 229.10(e)(1)(i).  The Proxy makes no effort to account for the failure to reconcile these non-GAAP measures to GAAP metrics.

82.     The results from the most recent quarterly earnings report, announced on February 8, 2017, demonstrate the unreliability of non-GAAP financial measures.  First quarter consolidated GAAP earnings per share were down $1.13 per share against previous results of $1.36 per share. Non-GAAP earnings per share were up to $1.24 per share from $1.18 per share.  But the Company suggested that non-GAAP measures provided a better sense of the performance of individual business segments despite their exclusion of interest and income tax expense, two items that directly reduce net income.  In fact, these non-GAAP metrics obfuscate and confuse stockholders as to the value of the Company under generally accepted accounting principles.

83.     Without disclosure of these reconciling metrics, the Proxy violates SEC regulations and materially misleads WGL stockholders.

### *Misleading Statements and Omissions Regarding the Company's Financial Projections*

84.     The Proxy discloses "Prospective Financial Information" that it provided to the Board, Goldman, Lazard, and AltaGas during the process leading up to the execution of the Merger Agreement.  The items disclosed include Adjusted EBIT for four key business segments, Capital Expenditures for the same four business segments, Non-GAAP Operating Earnings for the entire Company, and Non-GAAP Operating Earnings Per Share for the entire Company.

85.     The Proxy fails to disclose the following Company projections for years 2017 through 2021:  (i) estimates of unlevered free cash flow "as reflected in the Forecasts" used in Goldman's *Illustrative Discounted Cash Flow Analysis*; (ii) the respective definitions of unlevered free cash flow used by Goldman Lazard in their *Discounted Cash Flow* analyses; (iii) the forecasted values of EBITDA used by Goldman in its *Illustrative Discounted Cash Flow Analysis* "as reflected in the Forecasts" created by the Company; (iv) stock-based compensation expense; (v) interest; (vi) taxes; (vii) depreciation and amortization; (viii) change in net working capital; (ix) the forecasted estimated net income used by Goldman in its *Sum-of-the-Parts Analysis*; and (x) the forecasted estimated EBITDA used by Goldman in its *Sum-of-the-Parts Analysis*.  Without these measures, cherry-picking the disclosed projections materially misleads WGL stockholders, particularly where these measures are required to reconcile disclosed non-GAAP projections.

86.     Furthermore, the Proxy misleads WGL stockholders as to the content of the Company's forecasts provided to its financial advisors.  In the description of Goldman's financial analysis, the Proxy states that Goldman used estimates of unlevered free cash flow "as reflected in the Forecasts."  In the description of Lazard's financial analysis, however, the Proxy states that the "prospective financial information" provided by the Company "did not include an explicit calculation of unlevered free cash flows for the Company on a consolidated basis or for the Company segments."  This section then goes on to provide Lazard's calculations of unlevered free cash flow for WGL and its individual business segments.

87.     This contradiction as to the content of the prospective financial information maintained by the Company and provided to its financial advisors must be resolved to avoid materially misleading WGL stockholders.  While the Proxy affirmatively states that Goldman used

management's projections of unlevered free cash flow, if Goldman calculated its own estimates of unlevered free cash flow, these calculations should be disclosed like those created by Lazard.

88.     The statements in the Proxy are misleading because they provide shareholders a materially incomplete and distorted picture of the sales process underlying the Proposed Transaction, the various alternatives available to (and considered by) defendants other than the Proposed Transaction, and the efforts taken (or not taken) to ensure that no conflicts of interest tainted the negotiation process, rendering it unfair to Plaintiff and other members of the class. Without this omitted information, WGL shareholders cannot make a fully-informed decision whether to vote to approve the Proposed Transaction.

89.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and WGL

63.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64.     The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  WGL is liable as the issuer of these statements.

65.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

66.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

67.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

68.     The Proxy is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

69.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

70.     Because of the false and misleading statements in the Proxy, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

71.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of WGL within the meaning of Section 20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of WGL and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly involved in the making of the Proxy.

75.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

76.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.      Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  March 23, 2017          LEVI & KORSINSKY LLP

/s/ Elizabeth K. Tripodi
Donald J. Enright (#MD013551)
Elizabeth K. Tripodi (#979154)
1101 30th Street NW
Suite 115
Washington, D.C. 20007
Telephone:    (202) 524-4290
Facsimile:    (202) 333-2121

*Counsel for Plaintiff*